

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00063-CV

_____

IN THE INTEREST OF V.S., A CHILD

On Appeal from the 97th District Court
Clay County, Texas
Trial Court No. 2020-0143C-CV

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

After a bench trial, the trial court terminated M.S. (Father) and W.P.'s (Mother's) parental rights to their daughter, V.S.[1] Father appeals that decision, arguing that the evidence is legally and factually insufficient to support the finding that terminating his parental rights was in the best interest of V.S.[2] We affirm the trial court's judgment.

### II. BACKGROUND

V.S. was three years old at the time of trial. Father and Mother separated when V.S. was six or seven months old. V.S. eventually moved in with Father, but the Department of Family and Protective Services began an investigation due to allegations of drug use. V.S. tested positive for methamphetamine exposure, but Father refused to submit to a drug test for himself. At trial, Father denied being the source of V.S.'s exposure to drugs. After filing its petition in this case, the Department was named V.S.'s temporary managing conservator on July 22, 2020.

---

[1] We use aliases for the parents and child throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

[2] Mother has not appealed the trial court's decision to terminate her parental rights.

## A. Father's drug use

During a substance abuse assessment, Father reported that he had been using methamphetamine for about twenty years and that he had used methamphetamine every day, sometimes two grams a day. Father backed off this assessment in his trial testimony, claiming that he only used methamphetamine once or twice a week in July 2021 and had done so "on and off" for the previous year. He also claimed that his longest period of sobriety was four years, but admitted that period was probably from 2006 to 2010.

Father testified that he did not use methamphetamine between V.S.'s birth and her removal, though he admitted using drugs again (continuously) following her removal. Father claimed to have only spent $20 on drugs during the pendency of the case, explaining that he usually bought methamphetamine for other people with their money. When asked at trial to explain whether he was distributing methamphetamine, Father exercised his right to remain silent. He also claimed that the last time he used methamphetamine was November 2021, right before he went to jail.

## B. Father's criminal history

Father had previously been convicted in state court for forgery and possession of a controlled substance. He was placed on deferred adjudication community supervision for the forgery offense, but his probation was revoked after he admitted to using methamphetamines. He was convicted of forgery again in 2014. In 2017,

Father possessed methamphetamine on an Indian reservation and subsequently pled guilty to this charge in federal court. Father missed the first day of trial in this case as he began serving his federal sentence for that offense in November 2021. He was released on December 17, 2021.

## C. Father's failure to follow service plan and lackluster visitation

The Department's plan of service was made an order of the court. Father's caseworker, Shayna Pope, reviewed the service plan with Father at least three times, most recently in August 2021 at his apartment. Father was specifically ordered to do the following: maintain a safe and stable home, attend parenting classes, give the Department information about anyone residing in his home, attend and participate in a "Rebuilding Your Life" class, not engage in criminal activities, not associate with persons who engage in criminal activities, provide a monthly budget to the Department, find and maintain a job, complete a mental health assessment, complete a drug assessment and resulting recommendation, attend and participate in Narcotics Anonymous meetings at least twice a week, find a sponsor at one of these meetings, provide the Department with a written drug relapse plan, submit to random drug tests requested by the Department, submit to a drug assessment in the event of a failed drug test, complete a psycho-social assessment and participate in individual counseling, attend weekly visits with V.S., provide material necessities to V.S., and build a positive support network.

4

Father failed to comply with the court-ordered service plan in any meaningful way. According to Father, he lived in three different places between July 2020 and January 2022, and was homeless at least twice. At one time, Father lived in a trailer next to V.S.'s great-grandmother's home but had to move out when he failed to live up to his rent-free obligation to take care of the property. Father later moved in with his brother. There was methamphetamine use occurring in his brother's home while Father was there, but he testified that he was unaware of the drug use. After leaving his brother's home, Father ended up back at V.S.'s great-grandmother's property. Pope later received information that, at the time of trial, Father was living in a Motel 6. With regard to employment, Father had several jobs during the pendency of the eighteen-month case, most recently working part time with a former boss who does foundation repair. However, this job history only accounted for about eight months of the eighteen-month period. Father also failed to turn over any kind of a budget to his caseworker.

Father did not complete his required parenting classes or the "Rebuilding Your Life" class and failed to complete a mental health assessment—required because he had reported possible depression and anxiety and had previously been diagnosed with bipolar and major depressive disorder. He did do a drug assessment in November 2020, but failed to complete substance abuse counseling and did not formulate a relapse prevention plan. Father did not go to drug rehabilitation (as recommended following a failed drug test) and failed to attend Narcotics Anonymous

5

meetings weekly as required—nor did he try to obtain a sponsor. He also did not complete a psycho-social evaluation or participate in individual counseling as ordered.

Father admitted to using methamphetamine, thus failing to abstain from criminal conduct. Perhaps because of this, Father failed to submit to random drug testing, admitting that he "did not make them all the time." With regard to his missed drug tests, Pope testified that Father never asked for any rides or transportation to the screenings.

Father admitted that he did not provide to his caseworker the names of people with whom he lived. Nor did he try to "develop a social network to assist [him] with offering [V.S.] a healthy community environment." Relevant to this, Father also associated with people who had engaged in criminal behavior—both Father and Mother told Pope that Father's current girlfriend was arrested in 2021 and that she has an open child welfare case in Montague County.

Father's visits with V.S. were sporadic. He last saw her on November 5, 2021, just before he went to jail. His previous visit had been about five months before that date. The trial court had suspended Father's visits in the fall of 2020 because he had missed more than one drug test. Visitation was reinstated after Father resumed his tests, but he fell into a cycle of missing (or failing) drug tests, and then having future visits suspended. During the summer of 2021, Father seemed to be back on track, but missed three visits in a row during August. By his own admission, Father did not visit V.S. every time he had the opportunity, nor did he ever make up for his absences

6

by sending V.S. letters or cards. Father excused his absences by blaming oversleeping or transportation problems, but his caseworker testified that he declined offers of transport from her. In sum, Father visited V.S. approximately eight times during the pendency of the eighteen-month case.

## D. V.S.'s placement

V.S. has been living with K.A., a biological relative, since September 2020. V.S. has bonded with K.A. and her other children. Pope testified that K.A. (despite going through a recent divorce) was financially independent and could take care of V.S. K.A.'s plan is to adopt V.S.

## E. The Department's recommendation

Pope testified that Father failed to show "good parenting abilities." This testimony was based on her view that Father had not been able to provide stable housing for V.S., he was not drug testing when requested, he had trouble maintaining employment, and he had been associating with people who have a criminal history. Pope also asserted that Father was unable to provide stable housing for V.S. and that he would pose a continuing danger to V.S.'s physical and emotional health. The Department's current plan is for K.A. to adopt V.S. Should the planned adoption fail to occur, Pope testified that she was confident another home would adopt V.S. She recommended to the trial court that it terminate Father's parental rights, asserting that termination would be in V.S.'s best interest.

## F. The trial court's judgment

The trial court found by clear and convincing evidence that both Father and Mother had constructively abandoned V.S. and that they both failed to comply with the court-ordered family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (O). The trial court also found that termination of the parents' rights was in the best interests of V.S. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

## III. DISCUSSION

Father attacks both the legal and factual sufficiency of the evidence supporting the trial court's finding that termination was in V.S.'s best interest, arguing in part that this finding was based on economic disadvantage. Father does not challenge the trial court's predicate findings under subsections (N) and (O) of Section 161.001(b)(1) of the Family Code.

## A. Standard of review generally

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right,'" due process demands the heightened standard of clear and convincing evidence. *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting

8

*Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

## B. Legal Sufficiency

In evaluating the evidence for legal sufficiency to support a best-interest finding, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the termination is in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

9

## C. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support a best-interest finding. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether a factfinder could reasonably form a firm conviction or belief that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## D. The *Holley* Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of

10

nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a

11

finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## E. Analysis under *Holley*

### 1. Child's desires

V.S. was three years old at the time of trial. As such, she was unable to express any opinion regarding the case and her Father.

Because there was no evidence of V.S.'s desires, this factor is neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) ("[T]he first *Holley* factor is neutral because no evidence of the children's desires was presented.").

### 2. Child's emotional and physical needs and danger to the child now and in the future

Children need long-term safety and stability. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied). Father posed a danger to V.S. because of his long-term drug use and his inability (or disinclination) to stop using drugs during the pendency of V.S.'s removal.

Father admitted telling MHMR that he has used methamphetamine for twenty years. According to MHMR's assessment, Father said that he had used up to two

grams of methamphetamine every day during the month of July 2021. He also admitted during his testimony that he used methamphetamine once or twice a week ("on or off") for the last year and has tried to quit using drugs two or three times. From a parent's past misconduct, a factfinder may infer a parent's future conduct. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.) ("[E]vidence of past misconduct or neglect is permissible as an inference that a parent's future conduct may be measured by their past conduct.").

This drug use continued even after V.S. was removed. Although Father testified that he did not use drugs during the period between V.S.'s birth and July 2020, he admitted that he began using again shortly after V.S. was removed from his custody. *See In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *9 (Tex. App.—Fort Worth April 30, 2020, no pet.) (mem. op.) (holding that drug use through pendency of parental termination case weighed in favor of finding that parent posed a danger to child now and in the future); *see also In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.").

Importantly, Father has shown no inclination to stop using drugs. He received a recommendation from the Department to attend rehabilitation at Pine Street in Fort Worth, but he did not go. Even after the trial court granted an extension and Pine

13

Street had an available bed for Father, he still did not go. Moreover, Father's submission to random drug testing was spotty at best, and he even tested positive once.

Based on the extensive evidence of Father's drug use, both historically and after V.S. was removed, the trial court was entitled to find that V.S.'s emotional and physical needs would be adversely affected and that there would be an emotional and physical danger to V.S. Therefore, these factors weighed in favor of the trial court's best-interest finding.

### 3. Parental abilities of Father

The caseworker explained that, in her opinion, Father failed to show good parenting abilities. This was based on his aforementioned drug problems, along with his criminal history, his lack of household or employment stability, and his cohabitation with a woman who has both criminal and CPS history. In addition, Father failed to complete any of his parenting classes, to participate in a mental health evaluation, to attend his required Narcotics Anonymous meetings and obtain a sponsor, and to regularly visit or maintain contact with V.S. throughout the case. By contrast, V.S. has bonded with the relative placement family, and K.A. plans to adopt her. This factor weighs in favor of the trial court's best-interest finding.

### 4. Plans for the child of the individuals seeking custody

Father's plans for V.S. were vague and mostly centered on his view that it was in V.S.'s best interest to be returned to Mother. Unfortunately, Mother had many of

14

the same drug-related and stability problems experienced by Father. But Father seemed oblivious to any of the troubling issues in Mother's home. For example, he was unconcerned that Mother's current husband was convicted for failing to register as a sex offender. Nor did Father have much of a plan for staying off drugs, save "[s]taying busy with work."

The Department's plan is for V.S. to be adopted by her current placement. Though the placement had a pending divorce, she is financially secure and shares custody of her other children with their father. In addition, the placement remains close to V.S.'s great-grandmother and planned to regularly visit her with V.S.

This factor weighs in favor of the trial court's best-interest finding.

**5. Stability of home versus proposed placement**

Father testified that he was living in a camper on V.S.'s great-grandmother's property, but Mother cast doubt on this. According to the caseworker, Mother indicated that the camper was in an unlivable state and that Father was actually staying in a room in the house. The caseworker testified that she believed Father was living in a Motel 6, but she was unable to confirm this information. In any event, Father admitted to having been homeless more than once during the pendency of the case and understood that, during these periods, he had been unable to provide a safe and stable home for V.S.

By contrast, V.S. has been placed in a stable home, and the plan is for her to be adopted into that family. The caseworker testified that V.S. interacts well with her

placement family and that her needs (including medical appointments and transportation to and from daycare) are amply met.

This factor weighs in favor of the trial court's best-interest finding.

### 6. Programs available to assist these individuals to promote the child's best interest

Father failed to take advantage of any of the programs offered by the Department and ordered by the court. Despite his shortcomings with regard to parental abilities, Father failed to complete any of the court-ordered parenting classes. Also important was Father's refusal to participate in any of the programs that targeted his drug abuse. After completing a drug assessment, Father did not comply with any recommendations and did not continue with substance-abuse counseling. Father did not go to rehabilitation, did not attend Narcotics Anonymous meetings, and failed to appear for drug testing on three dates. Finally, though Father attended some of his required counseling, he did not complete it and was subsequently discharged for non-attendance.

This factor supports the trial court's best-interest finding.

### 7. Parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one and parent's excuse, if any, for the acts or omissions

As already explained, Father has an extensive history of drug abuse, an ample criminal history, no stable home, and infrequent visitation with V.S., and he has refused to take advantage of programs to pull him out of his substance-abuse cycles.

These acts and omissions by Father indicate that the parent-child relationship between him and V.S. is not a proper one.

But Father has excuses. Mainly, Father blames his "economic disadvantage" for most of his problems. Of course, a trial court cannot base its decision to terminate on evidence that the parent is economically disadvantaged, *see* Tex. Fam. Code Ann. § 161.001(c)(2), but that is not what happened here. First, the trial court specifically stated in its termination order that its decision was "not based on evidence" that Father was "economically disadvantaged." Second, most of the evidence constituting Father's bad acts (drug abuse, criminal history) is irrelevant to Father's financial situation. Third, Father's economic excuses vanish when examined in context with the actual evidence at trial. For example, though Father claimed that it was difficult for him to arrange transportation for visiting V.S. or going to drug tests, the caseworker testified that Father declined her offers to transport him, and Father admitted at trial to never asking the Department for help with transportation—even though he knew that it was a possibility. Also, even when he was forced to leave the trailer where he lived on V.S.'s great-grandmother's property, it was not for economic reasons; Father apparently quit the work he was doing in lieu of paying rent.

This factor supports the trial court's best-interest finding.

**F. Analysis and holding**

Father has done little to address the problems which—by his admission—have plagued his relationship with V.S.  By contrast, V.S. is in an adoption-motivated home where she has bonded with the family and receives all the care she needs.

We hold that the evidence is legally and factually sufficient to show that terminating Father's parental rights was in the best interest of V.S., and we overrule Father's sole issue.

## IV. CONCLUSION

Having overruled Father's best-interest issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  June 23, 2022